## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Edward White, | } | Case No. 17-40093-JJR |
| | } | Chapter 7 |
| Debtor. | } | |

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Lenora Marie Calloway, | } | Case No. 17-40462-JJR |
| | } | Chapter 7 |
| Debtor. | } | |

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Derick Wade Tidwell, | } | Case No. 17-40599-JJR |
| | } | Chapter 7 |
| Debtor. | } | |

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Barbara Conlin, | } | Case No. 17-00999-DSC |
| | } | Chapter 7 |
| Debtor. | } | |

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Paula Nicole McDaniel, | } | Case No. 16-72114-JHH |
| | } | Chapter 7 |
| Debtor. | } | |

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Reginald Tirrell Jackson, | } | Case No. 17-70171-JHH |
| | } | Chapter 7 |
| Debtor. | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Bankruptcy Administrator is again asking the court to impose sanctions against the attorneys named as defendants in two previously settled adversary proceedings, this time for their failure to comply with the court's order implementing the settlement. The settlement required, *inter alia*, that the defendants not charge additional fees or limit the scope of legal services for clients who retained them before March 21, 2016. The court finds the defendants failed to comply with its order, and will impose additional sanctions and civil penalties.

<u>Jurisdiction</u>

The court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. Title 28 U.S.C. § 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ." The matters covered by this opinion and order were raised by the Bankruptcy Administrator's motions and are contested matters under Rule 9014 of the Federal Rules of Bankruptcy Procedure (individually cited herein as a "Rule"), and involve the enforcement of an order previously entered by this court in cases under title 11, and matters arising in those cases. The parties have appeared at length before the court on the issues, and have thereby consented to this court's full adjudication of the issues. Thus, the court may enter a final order in these matters.

<u>Previous Adversary Proceedings</u>

In the spring of 2016, the United States Bankruptcy Administrator for the Northern District of Alabama, J. Thomas Corbett (the "BA"), filed two adversary proceedings (the "APs"), one each in the chapter 7 cases of William and Angela Cook,[1] and Diane Mikulin.[2] The defendants (the "Defendants") named in the APs were: (1) Mariellen Morrison a/k/a Mari Morrison ("Morrison"); (2) Law Solutions Chicago, LLC, d/b/a UpRight Law LLC and UpRight Law; and (3) UpRight Law LLC, d/b/a UpRight Law, LLC and UpRight Law. (The Defendants, excluding Morrison, are referred to as "UpRight.")  Morrison is a Birmingham attorney who regularly represents consumer debtors in bankruptcy courts in this District.  UpRight purports to be an amalgamation of attorneys and law firm entities that provides legal services, including bankruptcy representation, to consumer clients.  UpRight solicits clients through the internet and refers them to attorneys, such as Morrison, who practice in a locality where clients reside.  UpRight's principal office is physically located in Chicago, Illinois, although it purports to have hundreds of affiliated attorneys—who are referred to, in name only, as partners in their "Partnership Agreements"—in all 50 states.[3]  Each of the

---

[1] Case No. 15-41812-JJR7 (the "Cook Case"); A.P. No. 16-40016-JJR (the "Cook AP") styled as  J. Thomas Corbett, United States Bankruptcy Administrator for the Northern District of Alabama v. Mariellen Morrison; Law Solutions Chicago, LLC; and UpRight Law, LLC; filed on March 28, 2016.

[2] Case No. 15-83322-CRJ7 (the "Mikulin Case"): A.P. No. 16-80025-JJR (the "Mikulin AP") styled as  J. Thomas Corbett, United States Bankruptcy Administrator for the Northern District of Alabama v. Mariellen Morrison; Law Solutions Chicago, LLC; and UpRight Law, LLC; filed on April 5, 2016.

[3] At the court's request, UpRight's counsel provided the court with copies of two Partnership Agreements between Morrison and UpRight.  One agreement, dated June 25, 2014, was amended by an addendum dated September 9, 2015, and the other is dated March 17, 2016. The agreements refer to Morrison as the "Partner" and to UpRight as the "Firm."  The agreements were not introduced into evidence by any party, but were filed by the court under seal in each of the APs. (Cook AP Doc. 77, Mikulin AP Doc. 70.)

Defendants is a "debt relief agency" as defined in § 101(12A) of the Bankruptcy Code (11 U.S.C. § 101, *et seq.* and herein the "Code") and their clients are "assisted persons" as defined in § 101(3) of the Code.

In the APs, the BA asserted multiple claims against the Defendants. The most disturbing allegations involved a scheme utilized to pay the attorney's and filing fees in the Cook and Mikulin Cases. The Defendants' disclosures of compensation (official forms 2030) filed in those cases revealed attorney's and filing fees were paid by some combination of Sperro, LLC and Fenner & Associates, LLC ("Sperro/Fenner"), companies controlled by Brian Fenner, who was a business collaborator with the principals of UpRight.[4] As discussed below, the APs were eventually settled through mediation but the parties' settlement agreement did not reveal the particulars of UpRight's arrangement with Sperro/Fenner. Nonetheless, the fee payment scheme promoted by UpRight and Sperro/Fenner can be gleaned from the BA's complaints in the APs,[5] which were obliquely conceded by the Defendants in their answer filed in the Cook AP[6] (no answer was ever correctly filed in the Mikulin AP), as well as from the schedules and amended fee disclosures and statements of financial affairs filed in the Cook and Mikulin Cases.[7] Any uncertainties with regard to the scheme implemented by UpRight and Sperro/Fenner to put money in their own pockets, while

---

[4] The relationship between the principals of UpRight and Brian Fenner was revealed in *In re Williams, infra.*

[5] Cook AP Docs. 1 and 11; Mikulin AP Doc. 1.

[6] Cook AP Docs. 19, 20, and 24; Mikulin AP Docs. 8 and 10.

[7] After the BA began his investigation into the Sperro/Fenner scheme, the Defendants amended the disclosure of compensation in the Cook Case to disclose that Sperro had paid the attorney's and filing fees (the original disclosure in the Mikulin Case showed that Sperro paid the attorney's and filing fees). *See* Cook Case Doc. 1 p. 42; Doc. 35; Mikulin Case Doc. 1 p. 54; Doc. 35 p. 19.

exposing their clients to serious risks, were answered in a recent opinion issued by the United States Bankruptcy Court for the Western District of Virginia, *Robbins v. Delafield (In re Williams), and Robbins v. Morgan (In re Scott),* 2018 WL 832894 (Bankr. W.D. Va.; Feb. 12, 2018) (cited herein as "*In re Williams*").

Sperro/Fenner Repo Scam

As mentioned, the claims in the APs were settled by agreement through mediation and without the presentation of detailed evidence on the record, but the findings in *In re Williams* disclosed exactly how the debtors in the Cook and Mikulin Cases became ensnared in the repo scam that was at the heart of the BA's claims in the APs. *Williams* make explicit the workings of the scam that were implicit in the pleadings and bankruptcy documents filed in the APs and the Cook and Mikulin Cases. When a prospective bankruptcy client contacted UpRight, the client was asked whether he owned an encumbered vehicle, and if so, whether he intended to surrender it to the secured creditor who held the lien against the vehicle. If the client responded that he intended to surrender the vehicle, he was told to contact Sperro/Fenner, who would not only pick up the vehicle, but also pay the attorney's and filing fees to UpRight for the client's bankruptcy case. (In the Cook and Mikulin Cases, the Sperro/Fenner scheme saved the debtors $1,485 and $1,935, respectively.)

Sperro/Fenner would take possession of the vehicle at the client's residence and tow it to another state, often Indiana (based on the belief that Indiana state law allowed towing and storage charges to prime a secured creditor, thus allowing the vehicles to be held hostage). Sperro/Fenner then notified the secured creditor by mail that its collateral was in storage at a Sperro/Fenner facility, and gave the secured creditor a few days to pay Sperro/Fenner's sizable fees for loading, towing, and storing expenses, all unnecessary and fabricated. If the creditor did not concede to

the blackmail demand and quickly rescue its collateral, the vehicle was sold at auction, purportedly in conformity with state law and supposedly free of the creditor's lien.  According to the findings in *In re Williams,* this scam was utilized nationwide in hundreds of cases, which would include the Cook and Mikulin Cases, and resulted in UpRight's receipt of over $333,000 in attorney's fees.

<u>Risk of Civil & Criminal Liability and Denial of Discharge</u>

This court considers the Sperro/Fenner scheme—in which UpRight encouraged their clients to participate—as an intentional conversion of the secured creditors' collateral[8] and likely a crime in the State of Alabama (and Virginia according to the court in *In re Williams*).  Alabama Code 1975 § 13A-9-46 provides that, "A person commits the crime of defrauding secured creditors if he destroys, removes, conceals, encumbers, transfers or otherwise deals with property subject to a security interest with intent to hinder enforcement of that interest."[9]  And 18 U.S.C. § 152 provides that it is a federal bankruptcy crime to "knowingly and fraudulently conceal[] from a . . .

---

[8]  *See Ford Motor Credit Co. v. Owens (In re Owens)*, 807 F.2d 1556 (11th Cir. 1987) (affirming district court's ruling that entity selling collateral without remitting proceeds despite duty under floor plan agreement to do so was guilty of willful and malicious conversion, rendering liability of entity's principal nondischargeable in bankruptcy); *In re Roden*, 488 B.R. 736 (Bankr. N.D. Ala. 2013) (finding willful and malicious conversion committed each time debtor failed to remit assigned lease payments to secured lender); *see also Ally Fin. Inc. v. Wesley Goodson Chrysler Dodge Jeep LLC*, 2012 WL 13018911, at *9 (N.D. Ala. 2012) ("The elements of the tort of conversion have been long established, and these elements are relatively simple in their application to any given set of circumstances. To sustain a claim of conversion, there must be (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with another's property." (*quoting Drennen Land & Timber Co. v. Privett*, 643 So. 2d 1347, 1349 (Ala. 1994))).

[9]  *See Stokes v. State*, 373 So. 2d 1211 (Ala. Crim. App. 1979) (defendant convicted of selling a truck, which was subject to a bank's security interest, with intent to hinder, delay, or defraud the bank).  *See also Evans. v. Bank of Eureka Springs (In re Evans)*, 245 B.R. 852 (Bankr. W.D. Ark. 2000) (no discharge violation when debtor prosecuted under Arkansas criminal statute for defrauding secured creditor by selling collateral without creditor's permission and without remitting proceeds to creditor).

trustee or . . . from creditors . . . any property belonging to the estate of the debtor . . . [and a person who is guilty thereof] shall be fined under this title, imprisoned not more than 5 years, or both."

Additionally, this court is particularly troubled that UpRight's promotion of the Sperro/Fenner scam exposed its clients not only to possible civil and criminal liability, but also to claims by secured creditors for nondischargeability of debts owing to them under Code § 523(a)(6). That Code section provides that "(a) a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (6) for willful and malicious injury to another entity or to the property of another entity." A willful and malicious conversion constitutes a willful and malicious injury for purposes of nondischargeability. *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir. 1995). And "[t]he Eleventh Circuit recently explained that a 'knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of separate tortious conduct.'" *Westlake Flooring Co., LLC v. Staggs (In re Staggs)*, 573 B.R. 898 (Bankr. N.D. Ala. 2017) (*quoting In re Monson*, 661 Fed. Appx. 675, 682 (11th Cir. 2016) (*quoting In re Kane*, 755 F.3d 1285, 1295 (11th Cir. 2012)). *See also Mercantile Bk. of Ark., N.A. v. Speers (In re Speers)*, 244 B.R. 142 (Bankr. E.D. Ark. 2000) (selling motor home that served as bank's collateral without consent and without remitting proceeds to bank arguably rose to the level of the crime of defrauding a secured creditor and supported conclusion that debtor's act was malicious and debt was nondischargeable under Code § 523(a)(6).

Similarly, the debtors' participation in the Sperro/Fenner scheme at the urging of UpRight jeopardized the debtors' overall discharge and financial fresh start under Code § 727(a)(2)(A). That Code section provides that the court may deny a discharge for a "debtor [who], with intent to hinder, delay, or defraud a creditor . . . has transferred, removed . . . or concealed, or has permitted

to be transferred, removed . . . or concealed . . . property of the debtor, within one year before the date of the filing of the petition . . . ." *See In re Coady*, 588 F.3d 1312 (11th Cir. 2009) (affirming denial of discharge based on concealment of assets under Code § 727(a)(2)(A)); *In re Hiett*, 519 B.R. 341 (Bankr. M.D. Ala. 2014) (denying discharge based on concealment of assets with intent to hinder a creditor, and discussing *Coady*).   And finally, the Alabama Rules of Professional Conduct, which are similar to those in other jurisdictions, provide in Rule 1.2(d) that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyers knows is criminal or fraudulent . . . ."   As Judge Black stated in *In re Williams*:

> Making this proposal [to participate in the Sperro/Fenner repo scheme] to cash-strapped debtors was essentially offering them a Hobson's choice – one the debtors had to make without legal advice – all while Upright was offering its services under the guise of helping them make the proper decisions to reach their "financial independence." Upright preyed upon some of the most vulnerable in our society – as the [debtors] demonstrated – while they were under great stress. . . . The debtors were left to question if they did anything wrong, as well as the consequences they might face, without proper guidance and assurance.

*In re Williams* at *28.   The creditors and trustees in the Cook and Mikulin Cases have probably closed their books on UpRight, and the court has seen nothing to indicate that the debtors in those cases were anything other than innocent participants in UpRight's perverse scheme.   Regardless, the Settlement of the APs would not prevent state and federal law enforcement authorities, and state bar associations, from further investigating UpRight and Sperro/Fenner.[10]

---

[10] The court is not suggesting that the debtors should be criminally pursued or that they have intentionally done anything wrong.  The point the court wishes to emphasize is that UpRight knowingly placed its clients at risk while participating in a scheme that defrauded their clients' creditors, all for the purpose of putting money in UpRight's pocket.

### Settlement of the APs

In conjunction with, and in addition to the Sperro/Fenner allegations, some of the claims asserted in the APs challenged the propriety of the Defendants' Attorney Disclosures[11] and Retention Agreements in the Cook and Mikulin Cases.[12] The Attorney Disclosures revealed that the debtors in the Cook and Mikulin Cases, via Sperro/Fenner, paid a flat fee to the Defendants that covered basic bankruptcy representation—e.g., financial counseling, preparation of the petition and schedules, and attendance at the § 341(a) meeting of creditors. But according to the Attorney Disclosures and the Retention Agreements, that flat fee did not entitle the debtors to representation for an array of excluded bankruptcy proceedings and matters that might arise in their cases—e.g., dischargeability proceedings, motions for stay relief, motions to redeem property, lien avoidance, contested matters or adversary proceedings, contested exemptions, amendment to schedules, Rule 2004 examinations, continued 341 meeting of creditors, performing statement of intentions, motions to abandon or sell property, assisting with reaffirmation agreements, and monitoring an "asset case."[13] If the debtors wanted the Defendants to represent them in any of those excluded proceedings or matters, the Attorney Disclosures and the Retention Agreements warned the debtors that they would be required to pay additional fixed or hourly fees.

---

[11] Official Forms 2030, Disclosures of Compensation of Attorney for Debtor(s) required by Rule 2016 and Code § 329; herein referred to as the "Attorney Disclosures."

[12] Attorney Client Representation Agreements for Chapter 7 Bankruptcy Related Services required by Code § 528(a)(1); herein referred to as the "Retention Agreements."

[13] The limitation on the scope of services was stated in paragraph 7 of the Attorney Disclosures and paragraph 9 of the Retention Agreements.

The BA and the Defendants jointly requested mediation, which this court granted, and, as mentioned, the mediation resulted in settlement of the APs. The terms of settlement were memorialized in a Settlement Agreement (the "Settlement Agreement") that was effective as of September 13, 2016. The BA and Defendants filed a joint Motion for Court to Approve Compromise,[14] in which they asked the court to approve the Settlement Agreement that was attached to their motion. On October 27, 2016, the court issued its Order Approving Compromise (the "Agreed Order") which granted the parties' joint motion. (The Agreed Order and the Settlement Agreement are referred to as the "Settlement.")

Under of the terms of the Settlement, the Defendants agreed, *inter alia*, to (i) pay $50,000— $25,000 each to the trustees in the Cook and Mikulin Cases; (ii) not file new cases in this District for six months (except for clients who had previously retained the Defendants); and (iii) provide all legal services they had routinely excluded in their Attorney Disclosures and Retention Agreements without charging additional fees to debtors within this District who had retained the Defendants *before* March 21, 2016, except for representation in adversary proceedings.[15] The

---

[14] Cook AP Doc. 57, Order Approving at Doc. 61; Mikulin AP Doc. 40, Order Approving Doc. 44.

[15] There was no indication in the Settlement Agreement of why March 21, 2016 was selected as a cut-off date. Nonetheless, according to the BA, the dates the Defendants were retained by their clients were not necessarily the dates the Retention Agreements were signed. Rather, the BA argued that, although a Retention Agreement may be dated after March 21, 2016, if the Defendants first began accepting fee-payments from their clients before March 21, 2016, those clients were covered by the Settlement. Thus, if a debtor's Statement of Financial Affairs (Official Form 107) disclosed that fee payments, whether in full or partial, were accepted by the Defendants before March 21, 2016, the case was considered as falling under the terms of the Settlement. The court agrees with the BA's analysis regarding how the retention dates should be established and the Defendants did not argue otherwise.

latter settlement concession is found in paragraph 6 of the Settlement Agreement, and in pertinent part, reads as follows:

> For those clients who retained UpRight prior to March 21, 2016, UpRight shall provide the services referred to in Paragraph 9 of UpRight's standard client retention agreement without additional charge for attorney's fees, except as noted below. This paragraph shall affect only those bankruptcy cases filed by UpRight for clients who retained the firm prior to March 21, 2016 for bankruptcy representation in the Northern District of Alabama.

> Notwithstanding the foregoing, with regard to cases filed by UpRight for clients who retained UpRight prior to March 21, 2016, UpRight is entitled to charge its customary fees and/or hourly rates for such services as may be required of UpRight in pursuing or defending Adversary Proceedings . . . .

(Cook AP, Doc. 57-1 Ex. A.)

### BA's Motions Claiming Violations of Settlement

The BA routinely audits chapter 7 cases, and discovered that in cases filed for debtors who retained the Defendants before March 21, 2016, the Attorney Disclosures continued to require the payment of additional fees for legal services that the Defendants had agreed to provide without charge under the Settlement. On May 19, 2017, the BA filed Motions to Examine Debtor's Transactions with Attorney, Order Disgorgement of Fees and for Other Relief (the "BA Motions") in the White, Calloway, and Tidwell chapter 7 cases identified in the style of this opinion. The BA Motions are contested matters under Rule 9014, and claimed the Defendants failed to comply with the Settlement by continuing to exclude legal services they had agreed to provide at no additional cost in those cases covered by the Settlement. The BA Motions asked the court to hold the Defendants in contempt, assess sanctions and civil penalties, require disgorgement of fees, and bar the Defendants from filing cases in this District for two years.

On July 13, 2017 the court held a hearing on the BA Motions, and thereafter entered an Order to Appear and Show Cause ("Show Cause Order"), directing the Defendants to appear and show cause why sanctions were not warranted. The court conducted an evidentiary hearing on the

Show Cause Order, and thereafter the parties submitted briefs supporting their positions and the court took the BA Motions under advisement.

The Defendants' involvement in the Sperro/Fenner scheme triggered the BA's initial investigation in the Cook and Mikulin Cases and was a significant factor leading to the filing of the APs. The APs were settled; thus, the impropriety, if not illegality, of that scheme is not an issue that must be explicitly decided in the matters currently before the court. Nonetheless, the Defendants' involvement with Sperro/Fenner remains relevant because the court is not writing on a clean slate here. It must consider the history of the APs and their settlement in assessing the Defendants' motives and their pattern and practice of questionable conduct in the contested matters now before the court. Accordingly, the Sperro/Fenner ruse is particularly relevant because it directly contradicts UpRight's current defense that their motives have always been altruistic and that their failure to abide by the terms of the Settlement was an innocent oversight that is not deserving of additional sanctions or civil penalties.

<u>Post-Settlement Cases</u>

Following the Settlement, the Defendants filed six new cases[16] wherein the debtors had retained the Defendants before March 21, 2016, and in which the Attorney Disclosures continued

---

[16] There were eight chapter 7 cases (not included amongst the Post-Settlement Cases) that were pending, and had been filed *before* the Settlement, in which the Defendants were retained before March 21, 2016 (the "Pending Cases"), and therefore also fell within the coverage of the Settlement with regard to the expanded scope of services to be provided without additional charges. But unlike the Post-Settlement Cases, the Attorney Disclosures in the Pending Cases had been filed with the court *before* the Settlement. The BA contends that because the Defendants were retained in the Pending Cases before March 21, 2016, those cases should be considered in the same light as the Post-Settlement Cases and, according to the BA, the Settlement was violated when the Defendants failed to amend their previously filed Attorney Disclosures in the Pending Cases to reflect the terms of the Settlement. The BA's position is supported by Rule 2016(b) that requires supplemental Attorney Disclosures be filed by debtor's counsel "within 14 days after any payment or agreement not previously disclosed." Of course, the Defendants argue that the Settlement did not expressly require them to file amendments to their *previously* filed Attorney

Case 17-40599-JJR7    Doc 83    Filed 04/19/18    Entered 04/19/18 16:24:01    Desc Main
Document    Page 12 of 23

to wrongfully exclude legal services that were to be provided under the Settlement for no additional fees[17] (the "Post-Settlement Cases"):

1. *Edward White*, 17-40093-JJR7; retention date March 17, 2016; petition date January 20, 2017; Attorney Disclosure at Doc. 1, p. 47.

2. *Lenora Marie Calloway*, 17-40462-JJR7; retention date March 14, 2016; petition date March 14, 2017; Attorney Disclosure at Doc. 1, p. 51.

3. *Derick Wade Tidwell*, 17-40599-JJR7; retention date March 9, 2016; petition date March 30, 2017; Attorney Disclosure at Doc. 1, p. 51.

4. *Barbara Conlin*, 17-00999-DSC7; retention date February 1, 2016; petition date March 9, 2017; Attorney Disclosure at Doc. 1, p. 48.

5. *Paula Nicole McDaniel*, 16-72114-JHH7; retention date December 8, 2015; petition date December 7, 2016; Attorney Disclosure at Doc. 1, p. 53.

6. *Reginald Tirrell Jackson*, 17-70171-JHH7; retention date February 8, 2016; petition date January 30, 2017; Attorney Disclosure at Doc. 1, p. 47.

After the BA Motions seeking additional sanctions were filed, the Defendants, in a belated attempt to comply with the Settlement, filed Amended Attorney Disclosures that purported to

---

Disclosures. Although Rule 2016(b) provides considerable support to the BA's position, with hesitation the court has sided with the Defendants in respect to the Pending Cases. Thus, the court did not take into account the Defendants' failure to amend their Attorney Disclosures in the Pending Cases in determining whether to impose civil penalties and sanctions against the Defendants for violating the Settlement. However, it would be illogical to interpret the Settlement as allowing the Defendants to mislead their debtor-clients in the Post-Settlement Cases, for whom they had not filed cases on the effective date of the Settlement, by permitting the Defendants to file *original* Attorney Disclosures *after* the Settlement that misrepresented the scope of services they were required to provide. That said, amending the Attorney Disclosures in the Pending Cases (and Post-Settlement Cases), *before* the BA Motions were filed would have added some support to the Defendants' plea that their intentions were in good faith and that they were guilty only of innocent oversights. But no amended disclosures were filed until *after* the Defendants learned they were again in the BA's crosshairs. In light of their dubious history in this and other bankruptcy courts, the Defendants are not deserving of the benefit of the doubt.

[17] The Defendants filed no cases after the Settlement wherein they were retained before March 21, 2016 in which their Attorney Disclosures complied with the Settlement. Accordingly, the court assumes that if there were a hundred Post-Settlement Cases instead of six, none of the Attorney Disclosures would have complied with the Settlement.

expand the scope of legal services they would provide without additional fees in the Post-Settlement Cases that remained open; no amendments were filed in the two cases that had been closed before the BA Motions were filed. The BA argued that the Amended Attorney Disclosures were too little, too late, and the court agrees. The amendments were self-serving. Once the BA Motions were filed, the Defendants knew they faced possible additional sanctions. They were not motivated by a good faith attempt to correct an inadvertent oversight.[18] Rather, the court concludes that filing Settlement-compliant Attorney Disclosures when the Post-Settlement Cases were originally filed would have required the Defendants to deviate from their high-volume, monolithic business model, which they were not willing to do. Apparently the Defendants were under the misconception that the BA had closed his files on the settled APs and would not discover their non-compliance. Sanctions of $50,000, followed by a six-month bar on filing new cases was insufficient to get the Defendants' attention; they simply ignored the remainder of the Settlement. If the Defendants had been acting in good faith and wanted to demonstrate the same to the court and BA, they would have closely monitored their case filings in this District to make certain their Attorney Disclosures in the Post-Settlement Cases complied with the Settlement. They did not.

<u>Testimony and Excuses</u>

David Menditto, an UpRight lawyer from its Chicago office, testified in defense of UpRight at the hearing on the Show Cause Order. He is an attorney, although he is not admitted in Alabama or this District, and was not involved in the APs or their Settlement. Menditto testified that he joined UpRight in March 2017 as associate general counsel for litigation, with the primary responsibility for responding to inquiries and litigation surrounding UpRight's business model and conduct, such as the BA's Motions. He argued that so long as debtors in Post-Settlement Cases

---

[18] *See* nn. 16 & 17 *supra.*

were not actually charged an additional fee for any wrongfully excluded service, the Defendants were in compliance with the Settlement. In other words, the debtors should have used clairvoyance, and simply ignored the exclusionary language of the Attorney Disclosures if they were in need of services expressly excluded from the flat fee.

The Defendants maintain that they did not breach the terms of the Settlement in spite of their continued use of the services-exclusion-language in Post-Settlement Cases because the Settlement did not expressly require that Retention Agreements and Attorney Disclosures for yet-to-be-filed Post-Settlement Cases conform to the Settlement's requirements. That argument is incredulous; the Defendants have missed the point. The Settlement was for the benefit of the debtors in the Post-Settlement Cases, who knew nothing about the Settlement. Those debtors knew only what the Defendants disclosed in their Attorney Disclosures and Retention Agreements, which misrepresented the services the debtors were entitled to receive from the Defendants. If the debtors were not made aware of the scope of legal services they were entitled to receive in return for their flat fee payment, then the Settlement's requirement that the scope of services be expanded was illusory and of no benefit to anyone—other than the Defendants as a small price to pay for settling and avoiding further consequences of the Sperro/Fenner scheme.

In an attempt to show no actual harm to the debtors in the Post-Settlement Cases, Menditto testified that in preparing for the hearing on the Show Cause Order, he reviewed UpRight's records and he believed the Defendants never charged for any service that was wrongfully shown as excluded from the flat fee. However, he could not say with certainty that the Defendants actually performed any excluded service in any of the Post-Settlement Cases. He explained that it would not be uncommon for a local attorney, such as Morrison, to represent a debtor in a matter that required payment of additional fees under the terms of the Attorney Disclosure, and to forego any

additional fee.  (BA. Ex. 81, p. 128-129.)  The court hopes Menditto's supposition was accurate.  However, the court cannot ignore the chilling effect that the exclusionary language necessarily imposed on cash-strapped debtors who may have been in need of further representation they could not afford.

The Defendants argue that if the BA wanted to know how many debtors wanted additional representation, but failed to seek it due to the perceived extra fees, then the BA should have deposed the debtors in Post-Settlement Cases.  But the actual number of debtors who did not seek representation for lien avoidance motions, reaffirmations, redemptions, and other excluded services is not the issue here—the issue is that debtors were misled by the Defendants, and the debtors were necessarily harmed when they were given the wrong information regarding the scope of services the Defendants would provide for the flat fee.  It also reflected the Defendants' failure to take seriously their obligations under this court's order implementing the Settlement.

The Defendants noted in their response (Doc. 82) that the BA could have avoided all these unpleasantries by simply monitoring every Attorney Disclosure filed after the Settlement and placing a phone call to the Defendants if the BA saw any problems, and that the BA's failure to do so made him more culpable than the Defendants, citing *In re Jove Engineering, Inc.*, 171 B.R. 387, 394 (N.D. Ala. 1994); *rev'd* 92 F.3d 1539 (11th Cir. 1996).  While such intense monitoring may have been possible, the burden was not on the BA to monitor but on the Defendants to comply.  "This attempt to burden [one party] with policing [another's] misconduct is a complete derogation of the law.  It is well settled that '[e]ach party to a court order is responsible for ensuring its own compliance with that order and for shouldering the cost of compliance.'" *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996) (quoting *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.,* 793 F.2d 1529, 1535 (11th Cir.1986)).

The court does not accept as accurate Menditto's portrayal of UpRight's internet cartel as an altruistic enterprise aimed at serving financially distressed consumers in remote, often overlooked venues. That portrayal flies in the face of this court's own experience and that of other courts who have confronted the marketing strategies employed by UpRight, often at the expense of their clients. *See, e.g., In re Williams, supra*; *In re Banks*, 2018 WL 735351 (Bankr. W.D. La. 2018). Menditto testified that UpRight associated local lawyers, like Morrison, because UpRight desired to assist the under-served consumer bankruptcy candidates in this District, and indeed nationwide. To describe the Northern District of Alabama as an area where potential debtors are underserved by consumer bankruptcy lawyers is absurd, as a quick look at the phone book or the number of attorneys appearing on the court's docket plainly show. The consumer bankruptcy bar in this District is highly qualified and experienced, wide-ranging, dispersed throughout the District and easily accessible from all locations within the District. Members of the bankruptcy bar in this District—many of whom advertise—actively compete for potential clients in one of the highest-volume per-capita consumer bankruptcy districts of the country. UpRight seeks business out of this District because of the high number of cases it produces and thus the potential for profits, not as a public service endeavor. While a profit motive itself is not evidence of bad faith, the attempt to disguise UpRight's bankruptcy mill by painting its deficiencies with the brush of human kindness simply goes beyond the pale.

Equally troubling, Morrison, one of UpRight's "local" attorneys who often appears before courts in this District, apparently made no effort to read the Retention Agreements and Attorney Disclosures that were prepared by UpRight and filed under her electronic signatures in the Post-Settlement Cases. The deficiencies in the Attorney Disclosures filed in the Post-Settlement Cases

highlight the lack of attention Morrison gave to the work product coming out of UpRight's Chicago office.

Civil Penalties and Disgorgement of Fees

As stated above, the Defendants are each a "debt relief agency" under Code § 101(12A), and debt relief agencies—which include attorneys—must comply with Code §§ 526 and 707(b)(4)(B), and Rule 9011; failure to do so carries consequences. In pertinent part, § 526 reads as follows:

> (a) A debt relief agency shall not—
> . . .
> (2) make any statement . . . in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;
>
> (3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to—
>
>> (A) the services that such agency will provide to such person . . . .
>
> (b) (2) Any debt relief agency shall be liable to an assisted person in the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received, for actual damages, and for reasonable attorneys' fees and costs if such agency is found, after notice and a hearing, to have—
>
>> (A) intentionally or negligently failed to comply with any provision of this section . . . .
>
> (5) Notwithstanding any other provision of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may—
>
>> (A) enjoin the violation of such section; or
>
>> (B) impose an appropriate civil penalty against such person.

11 U.S.C. § 526.

18

Under Rule 9011, when the Defendants signed and filed the Attorney Disclosures, they "certif[ied] that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, [that] the . . . factual contentions have evidentiary support . . . ." The exclusion of services recited in the Attorney Disclosures filed in the Post-Settlement Cases was a contention that had no evidentiary support; it was false and misleading. And Code § 707(b)(4)(B) provides, "If the court finds that the attorney for the debtor violated rule 9011 . . . the court, on its own initiative or on the motion of a party in interest, in accordance with such procedures, may order—(i) the assessment of an appropriate civil penalty against the attorney for the debtor; and (ii) the payment of such civil penalty to the trustee, the United States trustee (or the bankruptcy administrator, if any)."

The Attorney Disclosures provided to the debtors in the Post-Settlement Cases and filed with the court contained material statements that were untrue and misleading, and misrepresented the scope of services those debtors could expect to receive in exchange for their flat-fee payment to the Defendants. Those untrue statements were not the result of a simple oversight or excusable neglect; they were the product of an arrogant disregard by the Defendants of their agreed-upon obligations under the Settlement. The Defendants had a duty to monitor the Post-Settlement Cases for compliance, and were also obligated to edit UpRight's standard Attorney Disclosures before they were filed so that those disclosures would accurately reflect the terms of the Settlement. The Defendants' indifference with respect to their obligations under the Settlement was tantamount to an intentional misrepresentation made in each Post-Settlement Case. Thus, pursuant to Code §§ 526 and 707(b)(4)(B), the Court concludes that civil penalties should be assessed against the Defendants and they should be required to disgorge and refund all fees and expenses received in the Post-Settlement Cases.

Accordingly, it is ORDERED that:

(a)  Monetary civil penalties are hereby assessed against the Defendants, jointly and severally, totaling $150,000—$25,000 for each of the six Post-Settlement Cases.  Said civil penalties shall be paid by the Defendants to the BA within twenty-one (21) days from the date hereof.

(b) Upon receipt of said civil penalties from the Defendants, the BA shall disburse therefrom the sum of $25,000 to each of the respective chapter 7 trustees in the Post-Settlement Cases.  In turn, each trustee shall apply said sum to pay, in order of priority, the following in each case:  (1) first, if previously closed, the fee payable to the clerk of court for reopening the case;[19] (2) second, because they were misled with regard to the services they were entitled to receive, $5,000 to the debtor(s); (3) third, the trustee's fees due under Code § 326(a); (4) fourth, unsecured creditors who have or will file proofs of claim after they are notified that a distribution will be made; and (5) last, the balance, if any, the debtor(s).

(c) Pursuant to Code § 526(c)(2)(A), all attorney's fees and filing fees paid to the Defendants in the Post-Settlement Cases shall be refunded to the respective debtors in such cases within twenty-one (21) days from the date hereof.  The Defendants shall provide proof to the BA that such refunds were timely made.

<u>Sanctions: Revocation & Suspension</u>

In every case under the Code, the court is empowered under Code § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

---

[19]  In all Post-Settlements Cases that have been closed, the trustees shall file motions to reopen those cases.

Case 17-40599-JJR7    Doc 83    Filed 04/19/18    Entered 04/19/18 16:24:01    Desc Main
Document      Page 20 of 23

No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to *enforce or implement court orders* or rules, or to prevent an abuse of process." (emphasis added). Thus, in addition to civil penalties and disgorgement of fees, the court concludes that non-monetary sanctions should be imposed against the Defendants pursuant to the court's statutory authority under Code § 105(a) to enforce compliance with its orders—i.e., the Agreed Order—and to prevent further abuse of the bankruptcy process by the Defendants, who have shown themselves undeterred by the original sanctions imposed by the Settlement.

Accordingly, it is further ORDERED that:

(d) UpRight's authority to file cases in this District is revoked for eighteen months (three months' sanction for each of the six violations in the Post-Settlement Cases) commencing immediately. During the eighteen-month revocation period, UpRight is prohibited from making referrals to other attorneys for potential bankruptcy clients who seek representation within this District. Upon being contacted by potential clients or referring attorneys during its revocation, UpRight shall inform such potential clients and referring attorneys that, by order of this court, UpRight is prohibited from filing cases in this District and prohibited from referring potential clients to other attorneys.

(e) UpRight shall forthwith refund to all clients within this District who have previously retained UpRight, but whose cases have not been filed, all fees and expenses paid by such clients, and UpRight shall inform those clients that by order of this court UpRight's authority to file cases in this District was revoked. UpRight shall not refer those clients to other attorneys. Copies of letters to those clients

informing them of UpRight's revocation, together with copies of cancelled checks evidencing refunds of fees and expenses, shall be promptly provided to the BA.

(f) Morrison's authority to file new cases in this District is suspended for sixty days commencing immediately. Nonetheless, Morrison may file cases during her suspension for clients who retained Morrison in her individual, non-UpRight-affiliated capacity, before her suspension. Morrison shall provide the BA with proof she was retained in such capacity before her suspension with respect to each case she files during her suspension. She may refer potential clients who first seek her legal services while she is suspended to other attorneys not affiliated with UpRight, but she may not accept a referral fee therefor. [20]

---

[20] The Settlement, a compromise between the Defendants and the BA, imposed civil penalties totaling $50,000—$25,000 for each of the Cook and Mikulin Cases, and barred the Defendants from filing cases in this District for sixty days—thirty days for each of the Cook and Mikulin Cases. There are six Post-Settlement Cases, and applying the same measure the parties considered appropriate in reaching their Settlement, results in civil penalties of $150,000 and, with respect to UpRight, eighteen months' revocation—$25,000 and thirty days for each of the six Post-Settlement Cases. Nonetheless, the court considered the totality of all the evidence and circumstances in arriving at the amount of penalties and duration of the revocation imposed hereunder.

With respect to why the court imposed sanctions against UpRight that are harsher than those imposed against Morrison (although Morrison and UpRight are jointly and severally liable for the $150,000 civil penalties as well as fee and expense disgorgement), the court is convinced that Morrison was a minor malefactor in the events that led to these contested matters. Other than cases filed by Morrison as a "partner" with UpRight, the court is not aware of other ethical problems involving Morrison. The court is convinced that Morrison—like other attorneys across the country—was enticed to join the UpRight team as a "partner" with visions of getting in on the ground floor of an emerging consumer bankruptcy industry that promised to disrupt the conventional manner in which bankruptcy clients are retained, not unlike Amazon's impact on the consumer retail business. Only time will tell if UpRight's business model of attracting new clients through the internet will succeed. But if it does, at least in this court, it will succeed only because UpRight and similar internet-based "firms" comply with traditional ethical standards and the requirements of the Code and Rules. The desire to mass produce business may not usurp the duty of every lawyer to provide his client with whatever individual, hands-on representation is required to ensure that client has the best chance of receiving the relief he deserves, and that degree of

(g) Notwithstanding the foregoing, the Defendants may continue to represent debtors in this District whose cases were filed before the entry of this opinion and order.[21]

So done and ordered this 19th day of April 2018.

/s/ James J. Robinson
JAMES J. ROBINSON
CHIEF U.S. BANKRUPTCY JUDGE

---

representation may not fit within UpRight's standard business model. Thus, based on the court's perception of Morrison's involvement in these matters, the court will not bar her from practicing in this District beyond sixty days, but once the sixty days expires, she must not accept referrals, or otherwise be associated with UpRight in this District, until UpRight's authority to practice within this District is reinstated.

In light of UpRight's conduct in this and other bankruptcy courts, Morrison may want to carefully reconsider the risks associated with being held out to the public as a "partner" in the UpRight organization. The potential monetary and professional liability of a lawyer who allows herself to be publicly advertised as a "partner" in a 500-member, nationwide "partnership," but in which she has no control and limited, if any, knowledge of her fellow partners, may outweigh the benefits. *See* n. 3, *supra*. (The court has not concluded that UpRight is in fact a legitimate partnership or law firm for the purposes of Code § 326, Rule 2016 or otherwise. In any event, UpRight promotes its affiliated lawyers as partners, even though it identifies itself as a limited liability company—a limited liability company has members, not partners.)

UpRight's revocation will require that it apply for readmission in this District. When and if such readmission is sought, UpRight shall provide the BA and this court with thirty days' advance written notice that it intends to seek readmission. After Morrison's sixty-day suspension expires, she may file cases without seeking authorization to do so but not as a "partner" or other affiliate of UpRight until its authority to practice in this District is reinstated. Morrison is reminded that any attempt to file cases during her sixty-day suspension, except for clients who retained her *before* her suspension in her non-UpRight affiliated capacity, may result in further sanctions.

[21] Morrison is not the only UpRight-affiliated lawyer that practices in this District. This opinion and order shall apply to UpRight regardless of whether its affiliated "local" lawyer in this District is Morrison or another lawyer. To the extent a lawyer practices in this District in his or her individual capacity, or as a member of a law firm, other than UpRight, this opinion and order shall have no application. Nonetheless, during its eighteen-month revocation, referrals by UpRight of clients within this District to lawyers, whether or not such lawyers are affiliated with UpRight, will violate this opinion and order.